IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 16 CR 793 |
| | ) | Judge Wood |
| MICHAEL PERSAUD, | ) | |
| | ) | |

**DEFENDANT MICHAEL PERSAUD'S MOTION TO BAR, IN PART, CERTAIN OPINIONS OF THE GOVERNMENT'S "EXPERT" WITNESS, DR. JOHN LEVINE, OR FOR A *DAUBERT* HEARING**

Defendant, Michael Persaud, by and through his undersigned counsel, moves this Court to bar, in part, the testimony of the Government's expert witness, Dr. John Levine, and for a *Daubert* hearing, and states as follows:

**I.      Background**

The Government intends to call as witnesses at trial two "experts." The Government's expert witness Disclosure is attached hereto. As set forth below, this Court should bar, in part, the testimony of certain of the opinions of one of those witnesses, Dr. John Levine, or, in the alternative, it should first hold a *Daubert* hearing with respect to those opinions.

**II.      Expert Legal Standard**

As the Supreme Court has noted, "[t]estimony emanating from the depth and scope of specialized knowledge is very impressive to a jury. The same testimony from another source can

1

have less effect." *Ake v. Oklahoma*, 470 U.S. 68, 82, n.7 (1985). Consequently, when a party moves to introduce scientific, technical, or specialized expertise this Court is obligated, under the Federal Rules of Evidence 104(a) and 702, to act as a "gatekeeper" to ensure the evidence "is not only relevant, but reliable." *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993); *Kumho Tire v. Carmichael*, 526 U.S. 137, 141 (1999).

In *Daubert*, the Supreme Court articulated the legal framework for how federal judges are to distinguish between reliable science and "science that is junky." *Kumho Tire*, 526 U.S. at 159. This framework entails considering five (non-exhaustive) factors. First, whether the forensic "theory or technique . . . can be (and has been tested)." *Daubert*, 509 U.S. at 593. Second, "whether the theory or technique has been subjected to peer review and publication." *Id.* Third, whether the technique has a "known or potential rate of error." *Id.* at 594. Fourth, whether there exists any "standards controlling the technique's operation." *Id.* Fifth, whether the technique is "generally accepted" by the scientific community. *Id.* These factors should assist district courts in determining "whether the reasoning or methodology underlying the testimony is . . . valid." *Id.*

Rule 702 further requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. As *Daubert* explains, this "condition goes primarily to relevance. 'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.'" *Daubert*, 509 U.S. at 591. These key principles were incorporated into an amended Rule 702, which now reads: If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience,

training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. This "newly-expanded rule goes further . . . to 'provide . . . some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony.'"

While the inquiry into 'reliable principles and methods' has been a familiar feature of admissibility analysis under *Daubert*, Rule 702 requires a trial judge to make an evaluation that delves more into the facts than was recommended in *Daubert*, including an inquiry into the sufficiency of the testimony's basis ('the testimony is based upon sufficient facts or data') and an inquiry into the application of a methodology to the facts ('the witness has applied the principles and methods reliably to the facts of the case') . . . Neither of these two latter questions that are now mandatory under the new rule-- the inquiries into the sufficiency of the testimony's basis and the reliability of the methodology's application--were expressly part of the formal admissibility analysis under *Daubert*." *Rudd*, 127 F.Supp.2d at 1337 (*citing Daubert*, Rule 702. As a result, all forms of expert have become subject to new scrutiny in light of *Daubert*, *Kumho Tire*, and Rule 702. District Court now have a "more significant gatekeeper role with respect to the admissibility of scientific and technical evidence." *United States v. Glynn*, 578 F. Supp. 2d 569 (S.D.N.Y. 2008).

In addition to considering Rule 702's requirements, this Court was also required to evaluate whether the probative value of an expert's testimony is substantially outweighed by

3

the danger of unfair prejudice, confusion, or undue consumption of time. Fed. R. Evid. 403. In other words, "the expert's methods must be evaluated, not only for [this Court's] gatekeeping role, but also to understand the impact of the evidence on the jury's job as the factfinder." *United States v. Green*, 405 F.Supp.2d at 119 (D. Mass. 2005).

Moreover, with respect to the burden of proof, it is always placed on the proponent who seeking to introduce a particular type of evidence. It is no different when it comes to expert testimony, as the proponent (here, the Government) must demonstrate that its expert's proposed testimony satisfies Rules 702 and 403. *United States v. Nacchio*, 555 F. 3d 1234, 1241 (10th Cir. 2009) ("The proponent of expert testimony bears the burden of showing that its proffered expert's testimony is admissible."). Indeed, in *Daubert*, the Supreme Court explicitly held that the burden of proof is set by Rule 104(a), and requires that the proponent of the evidence show by a preponderance of the proof that the basis for the proffered expert opinion is reliable. *Daubert*, 509 U.S. at 592, n.10. As the Supreme Court more has declared, "[S]ince *Daubert* … parties relying on expert evidence have had notice of the exacting standards of reliability such evidence must meet." *Weisgram v. Marley Co.*, 528 U.S. 440 (2009).

The Committee Note to the 2000 Amendments of Rule 702 expressly state that, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Indeed, "[m]any witnesses have learned to invoke experience as a means of circumventing the responsibility of supporting

4

an opinion with hard facts. For the witness, it eases cross-examination. But it also removes the scientific basis for the opinion."

### III. Argument – Dr. Levine

Certain of the "opinions" of Dr. Levine should be barred. Alternatively, at a minimum, this Court should conduct a *Daubert* hearing to allow Defendant and this Court to analyze how these opinions are relevant to this case, and the foundation for them.

The only basis or foundation that the Government proffers for these opinions is Dr. Levine' own "training and experience." *See* Government's Disclosure, at p. 3. In other words, it is because Dr. Levine says it so.

Here, the Government has indicated that it "anticipates that Dr. Levine may define "spam" and provides various opinions about "spam" and "spammers." To that end, the Government's Disclosure states in part:

> **Spam comprises the majority of emails sent in the world**. The most common use of spam is to advertise commercial products and/or services, **while the second-most common use of spam is to further fraud schemes**. Spam is technically sent the same way as any other email, but that people who send spam ("spammers") commonly use computer programs that connect to email servers and send lots of emails very quickly. Spammers typically obtain recipient email addresses by buying lists of addresses, or guessing recipient addresses. Spammers typically make money in exchange for sending spam on behalf of others.
>
> . . . **email providers and/or individual users commonly operate spam filters**, which are computer programs designed to automatically detect whether an incoming email is spam. If the **filter** determines that the email is spam, the filter will automatically block the spam from the user's inbox. These filters apply automated rules to determine whether an incoming email is spam, including by looking at an email's technical characteristics (*e.g.*, whether it was sent from an email server in a different country known for sending spam), the email's contents (*e.g.*, whether there are patterns in the email's text that is more likely to occur in spam), and/or by consulting 'blacklists' operated by various third parties. **Blacklists** are lists of IP addresses associated with email servers through which spam has been sent to complaining recipients, who have flagged given messages as spam. Once flagged, that spam can be traced to a specific email server through the spam's header data, and that email server's IP address

> reported to a blacklist. If an email server's IP address appears on a blacklist, then any spam filter who consults that specific blacklist will automatically block any emails sent by that server from reaching the recipient's inbox. **Spammers commonly attempt to defeat** spam filters in a variety of ways, including by arranging to route spam through different email servers or editing the spam's text.
>
> Dr. Levine may testify that **email providers typically have a r**ule, communicated to their users in **the providers' terms of service**, which prohibits using that email provider to send spam. The no-spam rule exists because once the IP address of an email provider's email server appears on any blacklist, then any spam filter consulting that blacklist will block any emails sent by that server. That would typically include any legitimate emails sent by other users of that email provider, who will experience error messages when they attempt to send emails. This would **typically** cause legitimate users of that email provider to cancel their service with that provider—thereby causing the provider to lose revenue—and move to a different provider that does not operate a blacklisted email server. Accordingly, **email providers typically prohibit users** from using their email service to send spam because of the risk of lost revenues from their email servers being blacklisted. The consequences of violating this rule may ultimately include termination of that user's account with the email provider. Spammers may attempt to defeat the providers' no spam rules through various methods, including by altering the timing of when they send spam relative to when they sign up for service, and by signing up for service from new email providers under a fake identity.

*Id.* at pp. 2-3 (emphasis added).

As an initial matter, *all* of the above "opinions" should be barred because this is *not* a case about "spam" or "spammers," and this Court should not let it be turned into one by way of the admission of any of the above testimony. To allow that type of irrelevant testimony, would clearly *not* assist the trier of fact. More importantly, it would substantially prejudice the Defendant and confuse and mislead the jury about what they are being ask to decide in this case. The only reason that the Government seeks to introduce this type of testimony is to make the Defendant look bad, and to appeal to the public's general dislike of "spam" and "spammers." Accordingly, any conceivable relevance of any of those "opinions" is substantially outweighed by the danger of undue prejudice to Mr. Persaud, and thus should be barred on that basis alone.

Even if the Government could overcome that hurdle, it has further failed to meet its

burden of establishing that Dr. Levine is an expert in anything – much less "spam" or "spammers." For that additional reason, his "opinions" should be barred. Alternatively, at a minimum, a *Daubert* hearing should be held to allow defense counsel to cross-examine Dr. Levine about how he is an expert in such subjects, and the foundation for that claim.

Further, the Government has failed to meet its burden that Dr. Levine's "opinions" are accepted within the relevant "scientific" community, or that such a community even exists. For that further reason, his "opinions" should be barred. Alternatively, again, at a minimum, a *Daubert* hearing should be held to allow defense counsel to cross-examine Dr. Levine about the existence of such a scientific community and how, if at all, his "opinions" are purportedly generally accepted within it.

Finally, at the most basic level, the Government has wholly failed to meet its burden, under both Rule 702 and *Daubert*, to provide any foundational basis whatsoever, including but not limited to, names of companies, documents, rules, procedures, studies, learned treatises, articles, or other materials that support in any way his wildly broad, unsubstantiated, and unsupported "opinions." Accordingly, without the benefit of a *Daubert* hearing, this Court cannot even assess in the first instance if there is any foundational basis of validity for any of these "opinions."

Moreover, equally important, Defendant and his counsel will be denied the opportunity to meaningfully confront and cross-examine Dr. Levine at trial with the materials that allegedly support his "opinions" and the materials that call them into question. Therefore, Dr. Levine's "opinions" should either be entirely barred, or a *Daubert* hearing should be held.

**WHEREFORE**, Defendant, Michael Persaud, by and though his undersigned counsel, respectfully requests the entry of an Order barring the expert opinions of Dr. Levine, or for the setting of a *Daubert* hearing, and for such other and further relief as is appropriate under the circumstances.

**RESPECTFULLY SUBMITTED,**

By: **s/Michael I. Leonard**
**One of the Attorneys for Defendant**

**CERTIFICATE OF SERVICE**

The undersigned states that, on November 18, 2018, he caused the above to be served on counsel of record by way of ECF filing.

**RESPECTFULLY SUBMITTED,**

By: **s/Michael I. Leonard**
**Counsel for Defendant**